## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA TAPIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-1257 |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | |
| corporation, and LT. PAUL | ) | |
| MACK and SGT. EDUARDO | ) | JURY DEMANDED |
| BELTRAN, in their | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Melissa Tapia alleges the following against Defendants the City of Chicago (the "City"), Lt. Paul Mack, and Sgt. Eduardo Beltran:

## I.     NATURE OF THE CLAIM

1.     This is an action brought to remedy discrimination in employment on the basis of sex in violation of the Equal Protection Clause, 42 U.S.C. § 1983, and the Illinois Civil Rights Act, 40 ILCS 23/5(a)(1).

2.     Plaintiff challenges the Chicago Police Department's ("CPD" or "Department") deep-seated and unconstitutional custom and practice of sex discrimination against women applying for promotion to and employed in prestigious units in CPD's "Special Functions" Division ("Special Functions").

3. Plaintiff seeks declaratory and injunctive relief and other equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights secured to her under federal and state law.

4. Plaintiff is a female sworn officer of the Chicago Police Department who began employment in July 2002.

5. Plaintiff is an experienced diver. She has certifications in open water diving, advanced open water diving, dry suit diving, nitrox diving, and rescue diving (which includes medical training).

6. In 2009, Plaintiff applied for a position with the Marine Unit, which is a unit of Special Functions. In addition to the Marine Unit, Special Functions includes the Helicopter Unit, the Bomb Squad, the Special Weapons and Tactics (SWAT) Team, and other high-profile operations.

7. Plaintiff hand-delivered her 2009 application to CPD's Human Resources Department, but never received any communication about that application. Despite her qualifications, she was not invited for an interview. In fact, she was not even invited to take the initial swimming test. CPD posted a hiring list and hired only male officers off the list.

8. In 2014, Plaintiff applied again for a position with the Marine Unit. She first took and passed the required swimming test. In or around April 2014, she interviewed for the position with Sgt. Robert Fitzsimmons and three other officers. Despite her qualifications and experience as a diver, Plaintiff was ranked only 26 out of 48 candidates interviewed for the job.

9.      In June 2018, Plaintiff was finally detailed to the Marine Unit for training.

10.      A single deputy chief oversees all Special Functions units.  In 2014, when Plaintiff applied for promotion to the Marine Unit, Steve E. Georgas was the deputy chief.

11.      The number of women employed in Special Functions during Deputy Chief Georgas' command was abysmal—and remains so today.  Based upon data available in March 2016, after Plaintiff had interviewed for the Marine Unit and was on the ranked hiring list:

a.      0 of 15 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women;

b.      0 of 66 members (0%) of the SWAT team, a prestigious position with training opportunities and extensive overtime, were women;

c.      at most 1 of 25 (4%) Marine Unit officers (title code 9168, D2 pay) was a woman, and she was detailed out to another unit (at the time there was one other female Marine Unit officer in training and another female officer, in a different title code, working as the Marine Unit secretary);

d.      0 of 5 (0%) Helicopter Unit officers (title code 9154) were women (the officer working as the Helicopter Unit secretary, in a different title code, was a woman);

    e.       4 of 42 (9.5%) explosives detection canine handlers (title code 9153, D2 pay) were women; and

    f.       3 of 21 (14%) Mounted Unit officers (title code 9169, D2 pay) were women.

12.     Since then, the numbers have not moved in the right direction. In June 2016, Georgas removed Lt. Allison Schloss—the only woman ever to command the Marine and Helicopter Unit—from her command.[1] Based upon CPD data from March 2018, just prior to Plaintiff being detailed to the Marine Unit for training:

    a.       0 of 11 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women; [2]

    b.       0 of 72 members (0%) of the SWAT team were women;

    c.       2 of 31 (6.4%) Marine Unit officers (title code 9168, D2 pay) were women;

    d.       0 of 4 (0%) Helicopter Unit officers (title code 9154) were women; and

    e.       6 of 44 (13.6%) explosives detection canine handlers (title code 9153, D2 pay) were women.

---

[1]     On March 15, 2018, Lt. Schloss filed a Title VII lawsuit against the City challenging her removal from command. *See Schloss v. City of Chicago*, Case No. 18-C-1880 (N.D. Ill.) (Durkin, J.). On May 30, 2018, Schloss amended her complaint to add *Monell* claims, alleging an unconstitutional pattern and practice of sex discrimination against women in Special Functions. *See Schloss*, ECF No. 16.

[2]     On March 18, 2018, Det. Maureen Bresnahan filed a sex discrimination lawsuit against the City challenging her rejection for promotion to the Bomb Squad. *See Bresnahan v. City of Chicago*, Case No. 18-C-1974 (N.D. Ill.) (Durkin, J.). On May 30, 2018, Bresnahan amended her complaint to add *Monell* claims, alleging an unconstitutional pattern and practice of sex discrimination against women in Special Functions. *See Breshnahan*, ECF No. 15.

13.    During Plaintiff's training in the Marine Unit from June 2018 until approximately February 1, 2019, Defendant Mack was the acting commanding officer of the Marine Unit and Defendant Beltran was the training officer in charge. Throughout Plaintiff's training, Beltran subjected Plaintiff to gender-based humiliation and ridicule; held her to standards different than the standards he held men to, and that were not job-related, either by the written job description for a Marine Unit officer or by objective standards; and forced her to train in dive equipment that did not properly fit, was dangerous to train in, and needed repair.

14.    In addition, throughout her training, Plaintiff was exposed to a "boys' club," sexually hostile work environment that included, among other things, male officers: (a) co-opting the only women's restroom facility to have bowel movements and leaving a filthy bathroom stall for them to clean; (b) ogling and photographing women on the lakefront; (c) openly using Tinder to find "hook ups"; and (d) urinating off the side of Marine Unit boats.

15.    On or before February 1, 2019, Mack and Beltran terminated Plaintiff's detail to the Marine Unit—and her opportunity for promotion—because of her sex.

16.    Unfortunately, Plaintiff's experience is not unique.  The experience of Lt. Allison Schloss, who Georgas terminated from command because of her sex; the experience of Det. Maureen Bresnahan, who was denied a promotion to the Bomb Squad, because of her sex; the scarcity (or even absence) of women in other Special Functions units; and the City's inherently subjective interview and selection

5

procedures for all positions in Special Functions evidence that the Special Functions Division is permeated with discriminatory bias against women.

17.     In addition to her own make-whole relief, Plaintiff seeks injunctive relief to ensure equal employment opportunities for female CPD officers seeking promotion to the Marine Unit and other positions in the Special Functions Division.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1443 (civil rights).

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

## III.     PARTIES

21.     Plaintiff Melissa Tapia is a woman and a CPD police officer.

22.     The City is and was at all times relevant a municipal corporation organized and existing under the laws of Illinois.

23.     Defendant Lt. Paul Mack is a CPD police lieutenant and was at all times relevant acting under color of law.  He is sued in his individual capacity.

24.     Defendant Sgt. Eduardo Beltran is a CPD police sergeant and was at all times relevant acting under color of law.  He is sued in his individual capacity.

## IV.  ADDITIONAL FACTUAL ALLEGATIONS RELATED TO CPD'S DISCRIMINATION AGAINST PLAINTIFF

25.     Plaintiff has been a sworn member of the Chicago Police Department since July 2002.

26.     After graduating from the Police Academy, Plaintiff was assigned to patrol in the 7th District.  She has also been assigned to patrol in the 3rd and 6th Districts.  From 2004 until June 2018, she was assigned to the Juvenile Intervention Center and the Missing Persons Unit, with her most recent position in that assignment being Missing Person Review Officer and Unit Secretary.

27.     After Mack and Beltran terminated Plaintiff's detail to the Marine Unit, she resumed her assignment in the Juvenile Intervention Center and Missing Persons Unit.

28.     Plaintiff is an experienced diver and has a number of certifications, including as a rescue diver.

29.     On June 4, 2018, Plaintiff was called up from the promotions list and detailed to and began training with the Marine Unit.  Historically, training for the Marine Unit lasted 14 weeks.  The training course for the CPD Marine Unit had no curriculum, no syllabus, and no outline of skills required to pass.  At the time Mack and Beltran terminated Plaintiff's detail, the training had lasted 35 weeks and had not yet been completed.  It was widely discussed among Marine Unit officers that the training went on for months longer than necessary because Beltran wanted to continue the convenient Monday through Friday schedule.

30.     Training was led by Beltran, along with 3 officers from the Marine Unit.  Beltran was late almost every day of training during the time Plaintiff was detailed to the unit.

31.     There were 15 officers in Plaintiff's training class—13 men and 2 women including Plaintiff.  Very few of the officers had any dive training and, on information and belief, none of the officers had as much dive training as Plaintiff.  At the time she was detailed to the Marine Unit, Plaintiff had logged over 100 hours of diving in a dry suit.

32.     Early in the Marine officer training, the training group went to the Police Academy to take the CPD's Peace Officer Wellness Evaluation Report ("POWER") test, which is a physical fitness test taken by all applicants to the CPD.  The passing standards on the POWER test are normed by age and sex, which means that the relative level of effort is identical for each age and sex group even though the absolute standards are different.  Beltran and the training staff were commenting on the POWER test, complaining that the CPD shouldn't have "separate standards" for females.  They also complained that the women's run time standards, which are around 12-17% slower than the corresponding time standards for men in the same age group, were "so slow" they should be able to complete the test "walking."

33.     Training began at the swimming pool at Near North High School, a Chicago Public School that has been closed since 2001.  The condition of the school and the pool was atrocious—roaches ran rampant throughout the building, there

was no air conditioning, the temperature in the pool was always around 90 degrees and, in the summer, the temperature in the building was often around 100 degrees.

**Beltran Singled Plaintiff Out for Humiliation,**
**Ridicule and Different Standards Because of Her Sex**

34. The first few weeks of training consisted of nothing more than running 3-4 miles and swimming about 2 miles a day. Five men voluntarily dropped out of the training in the first few weeks because it was so difficult.

35. On Friday of the fourth week of training, Beltran administered the same swim test that officers had to pass to get interviewed for the unit. Part of that swim test involved being able to pull oneself out of deep water onto the pool deck (the "pool exit test"). Pulling yourself onto a pool deck is not job-related for the CPD Marine Unit officer position because officers do not dive in pools. The first time she did the pool exit test during training, Plaintiff was not able to remove herself from the pool.

36. Beltran conducted a debriefing at the end of each week of training. At the first debriefing after the pool exit test, he humiliated and ridiculed Plaintiff in front of Mack and the training officers. He told her she was weak and said, "You need to do push-ups." He also said, "We'll give you one week and if you can't pass it next week, you're out."

37. The next week, Plaintiff was able to complete the pool exit test. Nevertheless, at the weekly debriefing, Beltran and Mack read Plaintiff the riot act because they determined that she did not exit the pool quickly enough. Mack told Plaintiff, "That looked like shit, I should send you back. You should have more

9

strength. Why are you so weak?" Beltran and Mack made Plaintiff write a "to/from" committing to work on her upper body strength.

38.     The Friday of the next week of training, Beltran spent the day screaming and yelling at the trainees and made them swim approximately 2500 meters just prior to the arrival of members of the Inspection Division, who were there to observe. With the members of the Inspection Division observing, the trainees were required to swim another 500 meters and then perform the pool exit test. Plaintiff performed all of the swimming and the pool exit test with no issues whatsoever. After that week, Beltran stopped conducting the swimming and pool exit tests for all the trainees.

39.     Nevertheless, throughout the time Plaintiff was detailed to the unit, Beltran would randomly make Plaintiff—and no one else—perform the pool exit test. On one occasion, Plaintiff was in the shower after the day of training and someone banged on the door and told her she needed to return to the pool to do the pool exit test.

40.     Each time Beltran made Plaintiff perform the pool exit test, she felt singled out and humiliated.

41.     In addition, throughout her training, Beltran would single Plaintiff out and berate and belittle her during dive debriefings—which were conducted after every dive—for any mistakes, no matter how minor. He did not similarly berate or belittle male trainees who made the same mistakes.

42.     Also, during dives in Lake Michigan, Beltran would blame Plaintiff for mistakes made by male officers, falsely claiming that she was the one who made them.

**CPD Provided Inadequate Changing Facilities**
**and Defective and Ill-Fitting Equipment to the Women Trainees**

43.     The facilities at the high school offered multiple locations for the male trainees to shower, change, and use the restroom.  In contrast, the two women in training were given one room to change in; it contained only one toilet and one shower.  There was no place for the women to hang up their belongings while they were changing and they brought their own hooks to hang up their clothes.

44.     The toilet in the women's changing room was the only toilet available to the trainees that had a door on the stall and, consequently, the men would often use that toilet, especially when they needed to have a bowel movement.  Plaintiff and the other woman trainee would be left to clean the toilet after the men used it and left a mess.  On occasion, a man would be using the toilet when it was time for the women to change to get ready for the day's training.  On these occasions, Sgt. Beltran and/or the training officers yelled at Plaintiff and the other woman in training for being late to the pool, even though they could not access their changing room, which had been co-opted by a man.

45.     After about the twelfth week of training, the trainees were issued their dry suits and diving training began.  Over the course of her detail, Plaintiff was issued five different dive suits.  Each of the suits was defective; they were in poor

condition, leaked, and the outer coverings were deteriorating. CPD did not own any appropriately-sized suits for female trainees.

46. For the first month or so, Plaintiff had to share her dry suit with the other female trainee because too many suits had to be taken out of service for repairs. No male trainees had to share dry suits.

47. Further, none of the dry suits issued to Plaintiff fit her properly. Plaintiff is 5'4" tall and the dry suits issued to her were designed for a man about 6' tall, weighing about 200 pounds. The boots on the suits were a men's size 10 and Plaintiff wears a women's size 8 boot (approximately a men's size 6). The AGA diving masks did not fit Plaintiff's face properly; she was given tubing to attempt to fill the gaps.

48. Because Plaintiff's equipment did not fit properly and she was given different equipment on a regular basis, it was difficult for her at times to determine what weight she would need in her weight belt during dives.

49. When Plaintiff complained about the ill-fitting equipment, she was told that if she didn't like it, she could order a custom suit and pay for it herself. Custom suits cost about $4,000.

**A "Boy's Club" Atmosphere Permeated the Marine Unit**

50. Beltran would require the female trainees to take care of his dive equipment—clean it, set it up, keep track of where it was. Beltran did not make the male trainees perform these tasks.

51.     Beltran would yell at the female trainees if they asked a question or sought clarification about any issue relating to their training.

52.     One of the training officers, Raul Echevarria, demonstrated particular animus toward the female trainees; he was very quick tempered and condescending with them and not with the male trainees.

53.     Part of the training included lifeguard training.  Other sergeants from the Marine Unit joined the training group in the pool for that training.  One of those sergeants, Sgt. Odin, could not complete the 600-meter swim and could not complete the task that involved picking up a brick from the bottom of the pool—both of which were required to be certified as a lifeguard.  Beltran passed Sgt. Odin anyway.

54.     When training sessions took place on the lake and beach, many of the men—both trainees and trainers—would ogle women on the beach in swimsuits and take pictures of women running on the beach.  Beltran spent a lot of time during training sessions looking for dates on Tinder.

55.     The Marine Unit boats no longer have bathrooms, because male officers did not want to clean them and took them out.  There was also no separate area for the female trainees to change in and out of their dive gear.  The training group would often spend up to 6 hours out on the boats, with no bathroom breaks. The men would urinate off the side of the boat, or in a cup and then toss the urine into the lake.  Plaintiff and the other female trainee had no way to relieve themselves on the boat.

13

56. The lack of bathroom facilities and bathroom breaks was especially troublesome when the women had their menstrual periods. Plaintiff mentioned this at one time to Mike Michalik, one of the trainers, and told him she would need to use a bathroom or she would be bleeding all over her dry suit. Michalik just looked at her blankly and did not respond.

**Beltran and Mack Terminated Plaintiff's Detail Because of Her Sex**

57. At the beginning of training, Mack would tell the trainees that there were only 5 spots available in the Marine Unit and that he would take only the top candidates from the training.

58. In December 2018, Mack instead informed the trainees that he was going to take all of them (at this point there were 9 left in the group of the original 15, including the two women). He said that they were just waiting for the weather to be cold enough so they could complete their ice dive. Mack said he knew all of them would do well on the ice dive and that he would find spots for all in the unit.

59. In December 2018, the training group was performing dives in Lake Michigan. The first day of those dives, it was 21 degrees. Plaintiff's dry suit was defective, too large, and leaked. After the dive, she had to sit, soaking wet and freezing, on the back of the boat. She developed a sinus infection and was out sick for a couple of days.

60. The second day she was out sick, Beltran contacted her to see if she was coming in for training because he wanted her to dive, even though she told him that she had a sinus infection. As an experienced diver, Beltran should have known

that it would be dangerous for her to dive with a sinus infection due to the pressure of being underwater.

61.     The next week, Beltran required Plaintiff to perform the most recent dive again, even though she was still sick.  Plaintiff had been given a different dry suit that day and it was even bigger than the most recent one she had been using. During the dive, she lost buoyancy and popped up to the surface.  Beltran began yelling at her, telling her that she had panicked.  At the debriefing that day—which Mack attended—Beltran kept insisting that Plaintiff had panicked and yelled at her in front of the whole group.  Plaintiff explained calmly that she had not panicked and instead had popped up because she didn't have enough weight on her weight belt because the dry suit was too big.  Beltran continued berating her, contending that the size of the dry suit shouldn't matter.

62.     Beltran told Plaintiff she was going to have to re-do the dive the next day.  The next day, when she entered the Chicago River, the carabiner at first got lost and she wasn't connected.  When she got back on the boat and prepared to do the dive, Beltran told her, "You better fucking get it right!"

63.     The dive involved going into the water, in near-zero visibility, and retrieving a "body," resurfacing, and handing the body up to an officer in the boat. On the next dive, Plaintiff retrieved the body and resurfaced.  She handed the body up to the officer in the boat and he handed her the rope to get out.  As she tried to grab the rope, the body dropped into the river because the officer responsible for

taking the body did not have a hold of it. Beltran blamed Plaintiff for not being "strong enough" to hand the body up to the boat.

64.     Mack was again present for the debriefing that day. After the debriefing, Mack and Beltran took Plaintiff up to a separate office where Beltran yelled at her for about 30 minutes; he called her "incompetent," said he didn't want to go to her funeral, and told her she couldn't "handle it." He told her that she had to do the dive again the next day. He said, "You get one more chance. If you don't get this dive perfect tomorrow, you're out."

65.     Plaintiff did the dive the next day perfectly, and Sgt. Beltran took the entire training group out for pizza.

66.     Even though many of the trainees had difficulty with both the lake and river dives, Beltran made Plaintiff—and only Plaintiff—write "to/from" memos about mistakes she had made on the dives.

67.     The following week, the training group was back at the pool. Raul Echevarria told the trainees they would have to do the pool exit test wearing equipment and their bathing suits. Echevarria was taking video of the trainees doing the pool exit. Because the trainees did not have their equipment with them, they had to use Beltran's equipment. Beltran's equipment was quite large on Plaintiff since he is about 6'1" tall and Plaintiff is 5'4" tall. Nevertheless, she was able to do the pool exit with the equipment.

68.     The training group was on furlough from December 14, 2018 until January 7, 2019. The first day back from furlough, the trainees had to do a 2500

16

meter swim.  Just after that, they did a dive in the pool, with dry suits, that lasted about an hour.  Plaintiff's dry suit didn't fit properly and was filling with water. Each member of the group had to climb out of the pool in their dry suit.  Mike Michalik was taking videos.  Because of the incorrect size of the dry suit, Plaintiff could not get her leg up to get out of the pool and she had to go to the end of the line and try again.  By the time Plaintiff got to the side of the pool to do the test again, her arms were too tired and she couldn't get out of the pool.

69.     This *ad hoc* test—exiting the swimming pool in a dry suit—was invented by Beltran.  It is not included in the written job requirements or training documents and is not job related.

70.     When Plaintiff did not complete this *ad hoc* test in an ill-fitting, water-filled dry suit, Michalik made her write a "to/from" about not being able to get out of the pool in the dry suit.

71.     Plaintiff continued to come to training every day for the next 3 weeks. Beltran said nothing to her about the *ad hoc* pool exit test.

72.     On Friday, February 1, 2019, Beltran called Plaintiff at about 6:30 p.m.  He told her, "I had to call you because we've terminated your detail."  He told her that he had concerns about the river dive back in December.  Plaintiff reminded him that he had told her she had to get it right and she had.

73.     That same evening, Plaintiff spoke to Mack.  He told Plaintiff that they were concerned that she was still having trouble getting out of the water.  Plaintiff told Mack that she never had any trouble getting out of the water onto any of the

17

boats and that she only had trouble getting out of the pool in her ill-fitting dry suit. Mack said, "you're the only one who has trouble in the pool."

74. The Marine Unit does not perform rescues in swimming pools. In fact, no one does pool rescues in marine dive gear.

75. Plaintiff was returned to her previous unit of assignment on the following Monday, February 4, 2019.

76. Plaintiff's experience of being singled out and humiliated because of her gender and being terminated from her detail in the Marine Unit evidences, and is the result of, the City's unconstitutional custom and practice of sex discrimination against women applying for promotion to and employed in the Special Functions Division.

77. The City's hostility toward women in the prestigious Special Functions units is too pervasive to be unintended. The intentionality of the hostility is unmistakable given how often and thoroughly it manifests itself. Both alone and together, the following examples lead almost inexorably to the conclusion that the City is now, and for years has been, intentionally deterring and preventing fully qualified women from enjoying equal employment opportunities in CPD's Special Functions Division. These acts and omissions cannot plausibly be explained except as a practice and custom of intentional sex discrimination:

    a.    The City has a long history of excluding women from jobs in the Special Functions Division. The statistics set forth in paragraphs 11 and 12 above evidence systemic and continuing discrimination against

18

women in the most prestigious and sought-after Special Functions units.

b. The City also has a long and persistent history of excluding women from command positions in Special Functions. The experience of Lt. Allison Schloss exemplifies and evidences a deep-seated bias against women serving as commanding officers in Special Functions. The City is aware of the problem but has taken inadequate, if any, steps to remedy it.

c. The City's sexually biased selection procedures for the Marine Unit, Bomb Squad and other Special Functions units include the use of subjective, non-blinded oral interviews. Such procedures inject discriminatory animus, gender bias, and gender stereotyping into the selections process. The City has taken inadequate, if any, measures to eliminate gender bias from the oral interview process for promotions to positions in Special Functions. On information and belief, the use of oral interviews in the application process for positions in Special Functions has resulted, and continues to result, in systemic sex discrimination against women.

d. The City's final decisions on promotions to the Marine Unit, Bomb Squad and, on information and belief, to other Special Functions units are based almost entirely on subjective criteria. In fact, the City's use of written tests for promotions in Special Functions is, for the most

19

part, an artifice. For example, the City uses a written test for the Bomb Squad but then invites the top 75 candidates to an oral interview. By inviting the top 75 candidates to interview and providing no advantage in final selection decisions to the top-scoring candidates, the City diminishes reliance upon the written test. Instead, it makes promotion decisions based upon subjective interviews, permitting unlawful and unconstitutional discrimination to contaminate the promotions process.

e.  On information and belief, and using a similar *modus operandi*, the City also has a long history of using invalid physical testing to deny promotions to qualified women applying to certain Special Functions units, including the SWAT Team.

f.  The City's intent to discriminate against women in Special Functions is also evidenced by its treatment of Lt. Schloss, who was removed from her position as the first and only female commanding officer of the Marine and Helicopter Units and replaced with a man with lesser qualifications and no Coast Guard experience.

g.  The City's intent to discriminate against women in Special Functions is also evidenced by its treatment of Det. Maureen Bresnahan, who was denied promotion to the Bomb Squad because of gender stereotyping and discrimination: after achieving the top score on the Bomb Squad promotions test, Det. Bresnahan was denied promotion

20

because the hiring manager, Sgt. James Egan, and two other men conducting the oral interviews, deemed her "best suited" for "clerical" or "office" work.

h.   The City's intent to discriminate against women is also evidenced by its use of recruitment materials that reflect gender stereotyping, do not portray women working in prestigious, specialized units, and hardly depict women out on the street.

i.   The City's intent to discriminate against women is also evidenced in its many public statements celebrating the hiring of "diverse" Police Academy classes with no mention of gender diversity.

78.   In contrast to the selection procedures used in Special Functions, the City's procedures for other promotions, including to evidence technician, detective, sergeant, and lieutenant, incorporate measures intended to reduce discriminatory bias.  Specifically, the written test scoring sheets are blinded to remove the candidates' names and other indicia of their race and sex so that racial and gender biases do not infiltrate the promotion process.

79.   The City is and has been aware that its selection procedures in Special Functions result in systemic discrimination against women.  In addition, it is and has been aware of the availability and efficacy of alternative selection procedures, including ones used for other promotions in the CPD, to reduce or eliminate gender bias.  Yet, despite the availability of measures to enhance equal employment opportunities for women, the City has taken no steps to replace its discriminatory

promotions procedures in Special Functions with neutral ones, resulting in an unconstitutional custom and practice of discrimination against women.

80.     In addition, the City is and has been aware of the pattern and practice of sex discrimination against women serving in, and denied promotion to, command positions in the Special Functions Division.

81.     The City has acted with deliberate indifference to the discrimination against women in the Special Functions Division.

82.     Unless restrained by the Court, the City will continue to employ policies, practices, and procedures that have no legally defensible job-related justification and discriminate against women, including by using practices either the same as or similar to those alleged in this complaint.

**FIRST CLAIM FOR RELIEF**
**Equal Protection – 42 U.S.C. § 1983 (*Monell*)**
**(Against the City of Chicago)**

83.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

84.     At all times relevant, the City of Chicago has acted under color of law.

85.     The City's intentional sex discrimination against Plaintiff and other women applying for promotion to and employed in CPD's Special Functions Division has been so widespread and well-settled as to constitute a standard operating procedure of the City, the *de facto* equivalent of a formal policy of sex discrimination with the force of law.

86.     As a direct and proximate result of the City's sex discrimination against Plaintiff, she has suffered injuries including but not limited to damage to her reputation, the loss of income, training and promotional opportunities, and emotional distress, including physical illness associated with such distress.

**SECOND CLAIM FOR RELIEF**
**Equal Protection – 42 U.S.C. § 1983**
**(Against Defendants Mack and Beltran)**

87.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

88.     At all times relevant, Defendants Mack and Beltran acted under color of law.

89.     Defendants Mack and Beltran intentionally discriminated against Plaintiff on the basis of her sex in violation of her equal protection rights by, in addition to other conduct, berating and humiliating her, subjecting her to unequal working conditions not assigned to men, otherwise creating a hostile work environment, and taking adverse action against her, including but not limited to terminating her detail in the Marine Unit.

90.     As a direct and proximate result of Defendant Mack's and Beltran's sex discrimination against Plaintiff, she has suffered injuries including but not limited to damage to her reputation, loss of income, training, and promotional opportunities, and emotional distress, including physical illness associated with such distress.

## THIRD CLAIM FOR RELIEF
### Illinois Civil Rights Act, 740 ILCS 23/5
### (Against the City of Chicago)

91. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

92. Through the actions described above, *i.e.,* berating and humiliating Plaintiff, subjecting her to unequal working conditions not assigned to men, otherwise creating a hostile work environment, and taking adverse action against her, including but not limited to terminating her detail in the Marine Unit, Defendant subjected Plaintiff to discrimination on the basis of her sex, in violation of 740 ILCS 23/5.

93. As a result of Defendant's violation of the Illinois Civil Rights Act, Plaintiff has suffered damages including but not limited to damage to her reputation, the loss of income, training and promotional opportunities, and emotional distress, including physical illness associated with such distress.

## INDEMNIFICATION
### (Against the City of Chicago)

94. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

95. Because Mack and Beltran were acting within the scope of their employment with the City, the City of Chicago is responsible under 745 ILCS 10/9-102 to indemnify them against compensatory damages, and may also pay associated attorneys' fees and costs, for which they are liable to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     Declare that the City has engaged in a policy, custom, or practice that deprived Plaintiff of rights protected by the Fourteenth Amendment and the Illinois Civil Rights Act;

B.     Order the City to adopt and implement policies, procedures, and practices that will curtail discrimination against women in the Special Functions Division;

C.     Order the City to reinstate Plaintiff to her detail in the Marine Unit and to take all necessary and appropriate steps to protect her from retaliation, and other appropriate injunctive relief;

D.     Appoint a monitor to ensure the City's compliance with the Fourteenth Amendment and the Illinois Civil Rights Act in the Special Functions Division;

E.     Award Plaintiff backpay, compensatory damages, and other make-whole legal and equitable relief;

F.     Order Defendants Mack and Beltran to pay punitive damages;

G.     Order the City to indemnify Mack and Beltran for compensatory damages awarded against them;

H.     Award Plaintiff her reasonable attorneys' fees, costs, and expenses, including expert witness fees, as provided for in 42 U.S.C. § 1988 and 740 ILCS 23/5;

I.     Award Plaintiff pre-judgment and post-judgment interest; and

J.     Order all other appropriate relief as the interests of justice may require.

<strong>JURY DEMAND</strong>

Plaintiff demands trial by jury on all claims and issues that may be tried to a jury.

Dated:  February 20, 2019      Respectfully submitted,


/s/ Cynthia H. Hyndman
Cynthia H. Hyndman
chyndman@robinsoncurley.com
Laura R. Feldman
lfeldman@robinsoncurley.com
Benjamin E. Schwab
bschwab@robinsoncurley.com
ROBINSON CURLEY P.C.
300 S. Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (Fax)

Marni Willenson
marni@willensonlaw.com
Samantha Kronk
skronk@willensonlaw.com
WILLENSON LAW, LLC
542 S. Dearborn Street, Suite 610
Chicago, IL  60605
(312) 508-5380
(312) 508-5382 (Fax)

Attorneys for Plaintiff